# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ALLIANCE FOR THE WILD ROCKIES;
NATIVE ECOSYSTEMS COUNCIL,
     *Plaintiffs-Appellants,*

v.

JANE L. COTTRELL, in her official
capacity as acting Regional
Forester; UNITED STATES FOREST
SERVICE, an agency of the United
States Department of Agriculture,
     *Defendants-Appellees.*

No. 09-35756

D.C. No.
9:09-cv-00107-
DWM

ORDER
WITHDRAWING
OPINION AND
DENYING
REHEARING AND
OPINION

Appeal from the United States District Court
for the District of Montana
Donald W. Molloy, District Judge, Presiding

Argued and Submitted
February 2, 2010—Seattle, Washington

Filed January 25, 2011

Before: William A. Fletcher and Johnnie B. Rawlinson,
Circuit Judges, and Michael W. Mosman,* District Judge.

Opinion by Judge William A. Fletcher;
Concurrence by Judge Mosman

---

  *The Honorable Michael W. Mosman, United States District Judge for
the District of Oregon, sitting by designation.

---

**COUNSEL**

Matthew Kellogg Bishop; WESTERN ENVIRONMENTAL LAW CENTER, Helena, Montana, Susan Jane McKibben Brown, WESTERN ENVIRONMENTAL LAW CENTER, Portland, Oregon, for the appellants.

John Emad Arbab, U.S. DEPARTMENT OF JUSTICE, Washington, D.C., Mark Steger Smith, OFFICE OF THE U.S. ATTORNEY, Billings, Montana, for the appellee.

---

**ORDER**

This Court's opinion, filed September 22, 2010, and published at 622 F.3d 1045 (9th Circuit 2010), is withdrawn and replaced by the attached opinion and concurrence.

With this filing, the panel has voted unanimously to deny Appellees' petition for rehearing. Judge W. Fletcher and Judge Rawlinson have voted to deny the petition for rehearing en banc, and Judge Mosman so recommends. The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35. The Appellees' petition for rehearing and petition for rehearing en banc are **DENIED**.

No further petitions for rehearing will be entertained.

---

## OPINION

W. FLETCHER, Circuit Judge:

Alliance for the Wild Rockies ("AWR") appeals the district court's denial of its motion for a preliminary injunction. AWR seeks to enjoin a timber salvage sale proposed by the United States Forest Service. Citing *Winter v. Natural Resources Defense Council*, 129 S. Ct. 365 (2008), the district court held that AWR had not shown the requisite likelihood of irreparable injury and success on the merits. After hearing oral argument, we issued an order reversing the district court and directing it to issue the preliminary injunction. *Alliance for Wild Rockies v. Cottrell*, No. 09-35756, 2010 WL 2640287 (9th Cir. June 24, 2010). In this opinion, we now set forth the reasons for our reversal, and we take this opportunity to clarify an aspect of the post-*Winter* standard for a preliminary injunction.

### I.  Background

In August and September of 2007, the Rat Creek Wildfire burned about 27,000 acres in the Beaverhead-Deerlodge National Forest in Montana. On July 1, 2009, almost two years later, the Chief Forester of the Forest Service made an Emergency Situation Determination for the Rat Creek Salvage Project ("the Project"). The Emergency Situation Determination permitted the immediate commencement of the Project's logging without any of the delays that might have resulted from the Forest Service's administrative appeals process.

The Project permits salvage logging of trees on approximately 1,652 of the 27,000 acres that were burned. The log-

ging will take place (and to some degree has already taken place) on thirty-five units of land ranging from 3 to 320 acres in size. The Forest Service describes the purpose of the Project as follows:

> . . . to recover and utilize timber from trees that are dead or dying as a result of the Rat Creek Wildfire or forest insects and disease and reforest the harvested units with healthy trees appropriate for the site. The trees would supply wood to the forest products industry.

A further purpose is to cut trees infested with dwarf mistletoe to prevent transmission to new trees.

Trees to be cut are those from 4 to 15 inches in diameter at breast height ("dbh") that have died or are likely to die as a direct result of fire or insect attack. The Forest Service has provided species-specific guidelines for determining likelihood of mortality. For example, Douglas-fir trees from 4 to 15 inches dbh are to be logged if less than 40% of the pre-fire live crown remains. Other conifers are to be logged if less than 80% of the pre-fire live crown remains. The severity of insect attacks is to be determined by examining trees for signs such as pitch tubes or boring dust.

Trees that survived the fire but are infected with dwarf mistletoe are to be cut, regardless of size, unless doing so would reduce the number of live trees below the Forest Service's wildlife habitat standard. Uninfested live trees, including those with a dbh larger than 15 inches, are to be cut only if required by safety concerns.

The Project requires construction of 7 miles of temporary roads and reconditioning of about 3 miles of existing roads. After completion of the Project, the temporary roads will be obliterated, and the existing roads will be returned to their current uses, if any.

In April 2009, the Forest Service released an Environmental Assessment ("EA") of the Project for public comment.

On June 15, 2009, the Acting Forest Supervisor for the Beaverhead-Deerlodge National Forest wrote to the Regional Forester requesting that the Chief Forester make an Emergency Situation Determination ("ESD") in connection with the Rat Creek Project. The ESD request stated that the emergency resulted from "rapid deterioration and decay of trees proposed for salvage harvest," noting that "[t]rees that have died or are dying from secondary fire effects are rapidly losing their value and merchantable volume." The request stated that immediate commencement of logging would "prevent substantial economic loss to the Federal Government." The sites to be logged are typically accessible to loggers for only four to five months out of the year due to heavy snowfalls. The request stated that the logging needed to commence immediately so that it could be completed before winter arrived.

The request stated further:

An objective for recovering the value of the fire-killed trees is to respond to local, regional, and national needs for commercial timber products. Local economies in Southwest Montana have developed with natural resource utilization as the foundation. This economic structure continues today and is becoming stressed and increasingly unstable due to higher energy prices, and reduced supply of timber from National Forest System lands. As markets decline and harvest activities on private lands decrease, the timber industry in Montana increasingly depends on National Forest System timber supply as an essential element to keep their mills operational.

On June 22, 2009, the Regional Forester forwarded the request for an ESD to the Chief Forester, noting that a "delay

in implementation of activities included in the request would result in substantial loss of economic value to the Federal Government." On July 1, 2009, the Chief Forester granted the request for an ESD. She wrote:

> [A] delay to implementing the project until after any administrative appeals have been reviewed and answered will result in a substantial loss of economic value to the government. Such a delay would push the award of timber sale contracts for the hazard tree and other salvage back to late October 2009, with winter access limitations delaying most operations until summer of 2010. By that time further deterioration of the affected trees will have resulted in a projected loss of receipts to the government of as much as $16,000 and significantly increased the likelihood of receiving no bids. An absence of bids would push the potential loss to the government to $70,000 and eliminate an opportunity to accomplish Douglas-fir planting and dwarf mistletoe control objectives.
>
> In evaluating whether an emergency situation exists with this project, I also took note of the importance this project has to the local economy of southwest Montana. I understand the wood products yielded by this project will be a critical contributor to helping keep local mills operational.

On July 22, 2009, the Forest Service issued the final Environmental Assessment ("EA") and a Decision Notice and Finding of No Significant Impact ("DN/FONSI"). The Forest Service concluded that the Project would not have a significant effect on the quality of the human environment and that an Environmental Impact Statement ("EIS") was therefore not required. The Forest Service then initiated a bidding process for the Project. On July 30, 2009, Barry Smith Logging was declared the highest bidder.

Plaintiff AWR filed suit in federal district court alleging violations of the Appeals Reform Act ("ARA"), the National Forest Management Act ("NFMA"), and the National Environmental Protection Act ("NEPA"). In a brief order entered on August 14, 2009, the district court denied AWR's request for a preliminary injunction. After quoting *Winter*, the court wrote, "After reviewing the parties' filings, the Court is convinced Plaintiffs do not show a likelihood of success on the merits, nor that irreparable injury is likely in the absence of an injunction. This determination prevents the issuance of a preliminary injunction at this stage of the proceedings." The court did not describe or analyze the merits of AWR's claims and did not describe or analyze the harm alleged by AWR. The court denied AWR's motion for a stay and injunction pending appeal to this court.

Barry Smith Logging began work on the Project on August 21, 2009. The parties indicated at oral argument that approximately 49% of the planned logging was completed before winter conditions halted operations.

AWR timely appealed the district court's denial of its request for a preliminary injunction. Because a significant amount of the Project remains to be completed, this appeal is not moot.

## II.   Standard of Review

We review a district court's denial of a preliminary injunction for abuse of discretion. *Lands Council v. McNair*, 537 F.3d 981, 986 (9th Cir. 2008) (en banc). An abuse of discretion will be found if the district court based its decision "on an erroneous legal standard or clearly erroneous finding of fact." *Id.* "We review conclusions of law de novo and findings of fact for clear error." *Id.* at 986-87. We will not reverse the district court where it "got the law right," even if we "would have arrived at a different result," so long as the district court

did not clearly err in its factual determinations. *Id.* at 987 (internal citations omitted).

### III.   Discussion

#### A.   "Sliding Scale" and "Serious Questions" after *Winter*

**[1]** In *Winter*, the Supreme Court disagreed with one aspect of this circuit's approach to preliminary injunctions. We had held that the "possibility" of irreparable harm was sufficient, in some circumstances, to justify a preliminary injunction. *Winter* explicitly rejected that approach. *Winter*, 129 S. Ct. at 375-76. Under *Winter*, plaintiffs must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction. *Id.* The Court wrote, "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 374. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Id.* at 376.

**[2]** The majority opinion in *Winter* did not, however, explicitly discuss the continuing validity of the "sliding scale" approach to preliminary injunctions employed by this circuit and others. Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another. For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits. *See, e.g.*, *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003). This circuit has adopted and applied a version of the sliding scale approach under which a preliminary injunction could issue where the likelihood of success is such that "serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor." *Id.* That test was described in

this circuit as one alternative on a continuum. *See, e.g.*, *Lands Council*, 537 F.3d at 987. The test at issue here has often been referred to as the "serious questions" test. We will so refer to it as well.

The parties in this case have devoted substantial portions of their argument to the question of the continuing validity of the "serious questions" approach to preliminary injunctions after *Winter*. For the reasons that follow, we hold that the "serious questions" approach survives *Winter* when applied as part of the four-element *Winter* test. In other words, "serious questions going to the merits" and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met.

Justice Ginsburg explicitly noted in her dissent in *Winter* that the "Court has never rejected [the sliding scale] formulation, and I do not believe it does so today." *Winter*, 129 S. Ct. at 392 (Ginsburg, J., dissenting). Justice Ginsburg emphasized the importance of the sliding scale approach, writing "[f]lexibility is the hallmark of equity jurisdiction." *Id.* at 391. As Justice Ginsburg noted, the majority opinion in *Winter* did not disapprove the sliding scale approach. Indeed, some of its language suggests that the approach survives. For example, the Court implied that balancing is appropriate when it indicated that "particular regard" should be paid to "the public consequences in employing the extraordinary remedy of injunction." *Winter*, 129 S. Ct. at 376-77.

**[3]** Our circuit has not yet directly discussed in a published opinion the post-*Winter* viability of the sliding scale approach. In our first post-*Winter* opinion, we recited the *Winter* four-part test and then wrote, "To the extent that our cases have suggested a lesser standard, they are no longer controlling, or even viable." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). We discussed the holding of *Winter* that a preliminary injunction

requires a showing of likely irreparable injury, but we did not discuss whether some version of the sliding scale test survived. *Id.; see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) ("In *Winter*, the Supreme Court definitively refuted our 'possibility of irreparable injury' standard . . . ."); *McDermott v. Ampersand Publ'g, LLC*, 593 F.3d 950, 957 (9th Cir. 2010) (ultimately applying a more stringent standard in light of First Amendment interests). In *National Meat Association v. Brown*, 599 F.3d 1093, 1097 n.3 (9th Cir. 2010), we wrote, "The district court applied our pre-*Winter* 'sliding scale' approach, which required only a 'possibility of irreparable injury' if plaintiff is likely to succeed on the merits." We then held that, although such an error might warrant remand, it was unnecessary in that case because all elements of the *Winter* test had been met. *Id.*

In *Johnson v. Couturier*, 572 F.3d 1067, 1084 (9th Cir. 2009), the district court had applied the "serious questions" test and held that "there are serious questions on the merits and the balance of hardships tips sharply in favor of plaintiff." The defendant objected that the district court had failed to "consider the element of irreparable harm." *Id.* We noted that the district court's approach was "questionable post-*Winter*[ ]," *id.*, but affirmed because the record supported a finding of a "likelihood of irreparable harm," *id.* at 1085.

Our other post-*Winter* published opinions are largely unilluminating on the question now before us. Some address wholly separate aspects of *Winter. See, e.g.*, *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022-23 (9th Cir. 2009) (emphasizing that *Winter* requires consideration of narrow injunctive relief). Others simply recite the *Winter* test without elaboration. *See, e.g.*, *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 721 (9th Cir. 2009); *Klein v. City of San Clemente*, 584 F.3d 1196, 1199-1200 (9th Cir. 2009).

Three other circuits have directly confronted the question whether some version of a sliding scale test has survived *Win-*

*ter*. They have split. The Fourth Circuit has held that the sliding scale approach is now invalid. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009) (holding that the circuit's prior test, which permitted "flexible interplay" among the elements, "may no longer be applied" after *Winter*), *vacated on other grounds*, 130 S. Ct. 2371 (2010). The Seventh and Second Circuits have held to the contrary.

The Seventh Circuit was the first to hold that the sliding scale test survives *Winter*, and that a weaker claim on the merits can still justify a preliminary injunction depending on the amount of "net harm" that could be prevented by the injunction. Citing *Winter*, Judge Easterbrook wrote:

> Irreparable injury is not enough to support equitable relief. There also must be a plausible claim on the merits, and the injunction must do more good than harm (which is to say that the "balance of equities" favors the plaintiff). How strong a claim on the merits is enough depends on the balance of harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief.

*Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009) (internal citations omitted).

The Second Circuit decision came down after the Supreme Court had decided two post-*Winter* cases, *Munaf v. Geren*, 553 U.S. 674 (2008), and *Nken v. Holder*, 129 S. Ct. 1749 (2009). Prior to *Winter*, the Second Circuit had employed a "serious questions" sliding scale test:

> For the last five decades, this circuit has required a party seeking a preliminary injunction to show (a) irreparable harm and (b) either (1) likelihood of suc-

cess on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and balance of hardships tipping decidedly toward the party requesting the preliminary relief. The "serious questions" standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction. Because the moving party must not only show that there are "serious questions" going to the merits, but must additionally establish that "the balance of hardships tips *decidedly* in its favor, its overall burden is no lighter than the one it bears under the "likelihood of success" standard.

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (emphasis in original; internal quotations omitted).

Judge Walker explained why the Second Circuit's "serious questions" test survived *Winter*:

The value of this circuit's approach to assessing the merits of a claim at the preliminary injunction stage lies in its flexibility in the face of varying factual scenarios and the greater uncertainties inherent at the outset of particularly complex litigation.

. . . .

The Supreme Court's recent opinions . . . have not undermined its approval of the more flexible approach . . . . None of the three cases comments at all, much less negatively, upon the application of a preliminary injunction standard that softens a strict

"likelihood" [of success] requirement in cases that warrant it.

. . . .

If the Supreme Court had meant for *Munaf*, *Winter*, or *Nken* to abrogate the more flexible standard for a preliminary injunction, one would expect some reference to the considerable history of the flexible standards applied in this circuit, seven of our sister circuits, and in the Supreme Court itself. . . . We have found no command from the Supreme Court that would foreclose the application of our established "serious questions" standard as a means of assessing a movant's likelihood of success on the merits. . . . Thus, we hold that our venerable standard for assessing a movant's probability of success on the merits remains valid . . . .

*Id.* at 35-38.

Dicta in two other circuits suggests that they will follow the Seventh and Second Circuits in preserving the flexibility of the sliding scale approach. The Tenth Circuit has a "modified test," similar to the "serious questions" test, under which "a movant need only show 'questions going to the merits so serious, substantial, difficult and doubtful, as to make the issues ripe for litigation and deserving of more deliberate investigation.' " *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208-09 n.3 (10th Cir. 2009) (quoting *Walmer v. U.S. Dep't of Def.*, 52 F.3d 851, 854 (10th Cir. 1995)). Since *Winter*, the Tenth Circuit has mentioned its "modified test" but indicated that it was not applicable to the case before the court. *Id.* The D.C. Circuit has touched upon this issue, noting that *Winter* "does not squarely discuss whether the four factors are to be balanced on a sliding scale." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009).

District courts in our circuit have grappled with the question of the sliding scale approach's validity after *Winter*. District Judge Alsup's analysis bears repeating:

> *Winter* concerned the end of the sliding scale where the weaker factor involves injury, not the end of the scale where the weaker factor involves the merits (but the injury is clear and the equities tip in favor of relief). *Winter* can, however, be construed to hold that the moving party must *always* show a probability of success on the merits (as well as a probability of injury).
>
> . . . .
>
> It would be most unfortunate if the Supreme Court or the Ninth Circuit had eliminated the longstanding discretion of a district judge to preserve the *status quo* with provisional relief until the merits could be sorted out in cases where clear irreparable injury would otherwise result and at least "serious questions" going to the merits are raised. . . .
>
> Can it possibly be that the Supreme Court and Ninth Circuit have taken away the ability of district judges to preserve the *status quo* pending at least some discovery and further hearing on the merits in such cases? This would be such a dramatic reversal in the law that it should be very clearly indicated by appellate courts before a district court concludes that it has no such power.

*Save Strawberry Canyon v. Dep't of Energy*, No. C 08-03494 WHA, 2009 WL 1098888, at *1-3 (N.D. Cal. Apr. 22, 2009) (citing three other district court cases in the Ninth Circuit with similar holdings).

**[4]** For the reasons identified by our sister circuits and our district courts, we join the Seventh and the Second Circuits in

concluding that the "serious questions" version of the sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision in *Winter*. In this circuit, the test has been formulated as follows:

> A preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor.

*Lands Council*, 537 F.3d at 987 (internal quotations and modification omitted). Of course, plaintiffs must also satisfy the other *Winter* factors. To the extent prior cases applying the "serious questions" test have held that a preliminary injunction may issue where the plaintiff shows only that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor, without satisfying the other two prongs, they are superseded by *Winter*, which requires the plaintiff to make a showing on all four prongs. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). But the "serious questions" approach survives *Winter* when applied as part of the four-element *Winter* test. That is, "serious questions going to the merits" and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest.

## B.   Preliminary Injunction

**[5]** Because it did not apply the "serious questions" test, the district court made an error of law in denying the preliminary injunction sought by AWR. We conclude that AWR has shown that there is a likelihood of irreparable harm; that there are at least serious questions on the merits concerning the validity of the Forest Service's Emergency Situation Determination; that the balance of hardships tips sharply in its favor; and that the public interest favors a preliminary injunction.

## 1.   Likelihood of Irreparable Harm

**[6]** *Winter* tells us that plaintiffs may not obtain a preliminary injunction unless they can show that irreparable harm is likely to result in the absence of the injunction. AWR's members use the Beaverhead-Deerlodge National Forest, including the areas subject to logging under the Project, for work and recreational purposes, such as hunting, fishing, hiking, horseback riding, and cross-country skiing. AWR asserts that its members' interests will be irreparably harmed by the Rat Creek Project. In particular, AWR asserts that the Project will harm its members' ability to "view, experience, and utilize" the areas in their undisturbed state.

The Forest Service responds that the Project areas represent only six percent of the acreage damaged by fire. It argues that because AWR members can "view, experience, and utilize" other areas of the forest, including other fire-damaged areas that are not part of the Project, they are not harmed by logging in the Project.

**[7]** This argument proves too much. Its logical extension is that a plaintiff can never suffer irreparable injury resulting from environmental harm in a forest area as long as there are other areas of the forest that are not harmed. The Project will prevent the use and enjoyment by AWR members of 1,652 acres of the forest. This is hardly a de minimus injury.

**[8]** "[T]he Supreme Court has instructed us that '[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable.' " *Lands Council*, 537 F.3d at 1004. Of course, this does not mean that "any potential environmental injury" warrants an injunction. *Id.* But actual and irreparable injury, such as AWR articulates here, satisfies the "likelihood of irreparable injury" requirement articulated in *Winter*.

## 2.    Likelihood of Success on the Merits

**[9]** AWR's strongest argument on the merits is that the Forest Service has violated the Appeals Reform Act ("ARA") and its implementing regulations by granting the Emergency Situation Designation ("ESD"). Regulations promulgated under the ARA provide that most Forest Service decisions are appealable through an administrative process. *See* 36 C.F.R. § 215.1 *et seq*; Forest Service Decisionmaking and Appeals Reform Act, Pub. L. No. 102-381, Title III, § 322, 106 Stat. 1374, 1419-21 (1992). The administrative appeals process would ordinarily be available for the Project at issue in this case. 36 C.F.R. § 215.11(a) (including as appealable decisions those for "projects and activities implementing land and resource management plans . . . documented in a Record of Decision (ROD) or Decision Notice (DN)"). If the Forest Service decision had been appealed administratively, there would have been an opportunity for members of the public, including plaintiffs, to object to the Project on various grounds. Implementation would then have been delayed until at least "the 15th business day following the date of appeal disposition." 36 C.F.R. § 215.9(b).

**[10]** The regulations provide an exception to the appeals process when the Forest Service makes an ESD. An ESD allows work to begin on a project as soon as notice of the otherwise appealable project decision is appropriately published. 36 C.F.R. § 215.10(c). The regulations define an Emergency Situation as "[a] situation on National Forest System (NFS) lands for which immediate implementation of all or part of a decision is necessary for relief from hazards threatening human health and safety or natural resources on those NFS or adjacent lands; or that would result in substantial loss of economic value to the Federal Government if implementation of the decision were delayed." 36 C.F.R. § 215.2.

**[11]** In granting the ESD for this Project, the Chief Forester considered three factors: (1) the loss of receipts to the

government due to delayed commencement of the Project; (2) the potential loss of an "opportunity to accomplish Douglas-fir planting and dwarf mistletoe control objectives"; and (3) the "importance this project has to the local economy of southwest Montana." We hold that, at a minimum, there are "serious questions" on the merits whether these three factors are sufficient to justify the ESD. We consider in turn the three factors upon which the Chief Forester relied.

[12] First, the potential loss of receipts to the government resulting from the delay inherent in the appeals process was not great. The Chief Forester wrote that a delay of the commencement of the project until the summer of 2010 would result in a "projected loss of receipts to the government of as much as $16,000." The Chief Forester wrote, in addition, that if the commencement of the project were delayed until 2010, this would "significantly increase[ ] the likelihood of receiving no bids." "An absence of bids would push the potential loss to the government to $70,000." With all due respect to the budgetary concerns of the Forest Service, a loss of anticipated revenues to the government of "as much as $16,000," or even a "potential loss" of $70,000 in the event of no bids, is likely not a "substantial loss . . . to the Federal Government."

Even if $70,000 might, in some contexts, constitute a "substantial loss," that figure here is highly speculative. The Chief Forester indicated that a one-year delay would "significantly increase[ ] the likelihood of receiving no bids," but we cannot know precisely what that statement means. We do know that with a 2009 commencement date, multiple bids were submitted almost immediately, and one was accepted. The likelihood of not receiving a bid in 2009 appears to have been essentially zero. An increase from a likelihood of essentially 0% to a likelihood of 10% would be a significant increase in likelihood. But a 10% risk of receiving no bids results in a risk-adjusted loss of 10% of $70,000, or $7,000. A risk-adjusted loss of $7,000 is not significant.

**[13]** Second, the loss of the opportunity to "accomplish Douglas-fir planting and dwarf mistletoe objectives" would be an actual loss only if there were no successful bid on the Project. That is, the Chief Forester concluded that if there were a bid on the Project, the monetary loss to the government would be "as much as $16,000." But in that event, there would be no loss of opportunity to plant Douglas firs or to control dwarf mistletoe, for those objectives would be accomplished by means of the logging contract. Only if there were no bids on the contract would the opportunity be lost. For the reasons just discussed, the possibility of no bids appears to us to be highly speculative. In addition, the Forest Service did not even attempt to quantify the extent of its mistletoe abatement objectives that would be achieved through this Project. It is unclear from the record whether the acres selected are particularly infested with mistletoe and therefore the Project is essential to the Forest Service's goals, or if mistletoe abatement on these acres is simply a serendipitous byproduct of the Project.

**[14]** Third, the Chief Forester took into account the importance of the Project to the local economy of southwest Montana. As discussed below, this factor is relevant to the public interest element of the preliminary injunction analysis. But the impact of a project on a local economy is not one of the factors the Chief Forester was permitted to consider in deciding whether to issue an ESD. Under Forest Service regulations, she was permitted to consider "hazards threatening human health and safety or natural resources" and any "substantial loss of economic value to the Federal Government." 36 C.F.R. § 215.2. Neither the regulation, nor the ARA, permits consideration of the local economy in making an ESD determination. Thus, in relying on the third factor, the Chief Forester "relied on factors Congress did not intend [her] to consider." *Lands Council*, 537 F.3d at 987.

**[15]** Finally, we note that the Forest Service has not been able to make clear to us, either in its briefing or at oral argu-

ment, why it waited so long to request an ESD. The Rat Creek fire occurred in August and September of 2007. The ESD was requested, and then issued, almost two years later. The delay in requesting an ESD obviously undermines the Chief Forester's determination in July 2009 that there was an Emergency Situation that justified the elimination of otherwise available administrative appeals.

**[16]** We therefore conclude that AWR has, at a minimum, raised "serious questions" on the merits of its claim regarding the validity of the Chief Forester's Emergency Situation Determination.

### 3.     Balance of Hardships

We conclude that the balance of hardships between the parties tips sharply in favor of AWR. When the question was before the district court, logging was contemplated on 1,652 acres of land in the Beaverhead-Deerlodge National Forest. Once those acres are logged, the work and recreational opportunities that would otherwise be available on that land are irreparably lost.

In addition, AWR was harmed by its inability to participate in the administrative appeals process, and that harm is perpetuated by the Project's approval. The administrative appeals process would have allowed AWR to challenge the Project under both NFMA and NEPA, and to seek changes in the Project before final approval by the Forest Service. Such administrative appeals sometimes result in significant changes to proposed projects.

The hardship to the Forest Service, set against the hardship to AWR, is an estimated potential foregone revenue of "as much as $16,000," and a much more speculative loss of up to $70,000. These foregone revenues are so small that they cannot provide a significant counterweight to the harm caused to AWR. In addition, as noted above, the Forest Service's oppor-

tunity to mitigate mistletoe infestation and to replant Douglas firs is tied to whether the Project occurs or not. Because we conclude that the risk that the project will not occur at all is speculative, those lost opportunities similarly cannot outweigh the harm to AWR.

**[17]** The balance of the hardships here tips sharply enough in favor of AWR that a preliminary injunction is warranted in light of the serious questions raised as to the merits of its ARA claim. That decision, however, does not end our analysis, as the preliminary injunction must also be in the public interest.

### 4.    Public Interest

**[18]** In this case, we must consider competing public interests. On the side of issuing the injunction, we recognize the well-established "public interest in preserving nature and avoiding irreparable environmental injury." *Lands Council*, 537 F.3d at 1005. This court has also recognized the public interest in careful consideration of environmental impacts before major federal projects go forward, and we have held that suspending such projects until that consideration occurs "comports with the public interest." *S. Fork Band Council*, 588 F.3d at 728. While that public interest is most often noted in the context of NEPA cases, we see no reason why it does not apply equally to violations of the ARA. In the ARA, Congress specifically identified the process through which it wanted the Forest Service to make project decisions such as this one. It comports with the public interest for the Forest Service to comply faithfully with those procedures and to use the exceptional emergency procedures sparingly and only in compliance with its own implementing regulations.

We will not grant a preliminary injunction, however, unless those public interests outweigh other public interests that cut in favor of *not* issuing the injunction. *See Lands Council*, 537 F.3d at 1005 ("Consistent with *Amoco Production Company*,

we have held that the public interest in preserving nature and avoiding irreparable environmental injury outweighs economic concerns in cases where plaintiffs were likely to succeed on the merits of their underlying claim."). "The public interest analysis for the issuance of a preliminary injunction requires us to consider whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 596 F.3d 1098, 1114-15 (9th Cir. 2010) (internal quotations omitted).

**[19]** The public interests that might be injured by a preliminary injunction here, however, do not outweigh the public interests that will be served. The primary public interest asserted by the Forest Service is that the Project will aid the struggling local economy and prevent job loss. The effect on the health of the local economy is a proper consideration in the public interest analysis. The Forest Service asserts that the Project would directly create 18 to 26 temporary jobs and would have indirect beneficial effects on other aspects of the local economy. The record before us reflects that the jobs in question, and, for the most part, the indirect effects, will begin and end with work on the Project which is now expected to be completed in 2010.

**[20]** On these facts, we conclude that issuing the injunction is in the public interest.

## Conclusion

We conclude that the district court erred in denying AWR's request for a preliminary injunction. AWR has established a likelihood of irreparable injury if the Project continues. AWR has also established serious questions, at the very least, on the merits of its claim under the ARA. Because AWR has done so with respect to its claim under the ARA, we do not reach its claims under NFMA and NEPA. The balance of hardships between the parties tips sharply in favor of AWR. Finally, the public interest favors a preliminary injunction.

We therefore **REVERSE** and **REMAND** for further proceedings consistent with this opinion.

---

MOSMAN, District Judge, concurring:

Today's holding that the "serious questions" test remains valid post-*Winter* is an important one for district courts tasked with evaluating requests for preliminary injunctions. The task is often a delicate and difficult balancing act, with complex factual scenarios teed up on an expedited basis, and supported only by limited discovery. A sliding scale approach, including the "serious questions" test, preserves the flexibility that is so essential to handling preliminary injunctions, and that is the hallmark of relief in equity. *See Winter*, 129 S. Ct. at 391 (Ginsburg, J., dissenting); *see also Miller v. French*, 530 U.S. 327, 361 (2000) (Breyer, J., dissenting) ("[I]n certain circumstances justice requires the flexibility necessary to treat different cases differently—the rationale that underlies equity itself."); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it.") (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)); *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946) ("Equity eschews mechanical rules; it depends on flexibility.").

While the Supreme Court cabined that flexibility with regard to the likelihood of harm, there are good reasons to treat the likelihood of success differently. As between the two, a district court at the preliminary injunction stage is in a much better position to predict the likelihood of harm than the likelihood of success. In fact, it is not unusual for the parties to be in rough agreement about what will follow a denial of injunctive relief. In this case, for example, the parties agree that more than 1,600 acres would be logged in the absence of

an injunction. While they disagree about the implications of the logging—such as the extent of environmental impact or the value of natural recovery—the mere fact of logging is undisputed.

But predicting the likelihood of success is another matter entirely. As mentioned, the whole question of the merits comes before the court on an accelerated schedule. The parties are often mostly guessing about important factual points that go, for example, to whether a statute has been violated, whether a noncompetition agreement is even valid, or whether a patent is enforceable. The arguments that flow from the facts, while not exactly half-baked, do not have the clarity and development that will come later at summary judgment or trial. In this setting, it can seem almost inimical to good judging to hazard a prediction about which side is likely to succeed. There are, of course, obvious cases. But in many, perhaps most, cases the *better* question to ask is whether there are serious questions going to the merits. That question has a legitimate answer. Whether plaintiffs are likely to prevail often does not.