William A. BAUDLER, Regional Director of the Thirty–Second Region of the National Labor Relations Board, for and on behalf of the National Relations Board, Petitioner,

v.

AMERICAN BAPTIST HOMES OF THE WEST, doing business as Piedmont Gardens, Respondent.

No. C 11–2480 CW.

United States District Court, N.D. California.

July 19, 2011.

Jennifer Englert Benesis, Gary Connaughton, Valerie Theresa Hardy–Mahoney, National Labor Relations Board, George Patrick Velastegui, Attorney at Law, Oakland, CA, for Petitioner.

David Scott Durham, Christopher T. Scanlan, Gilbert J. Tsai, Howard Rice a Professional Corporation, San Francisco, CA, for Respondent.

## ORDER GRANTING NLRB'S PETITION FOR AN INJUNCTION UNDER SECTION 10(j) OF THE NATIONAL LABOR RELATIONS ACT

CLAUDIA WILKEN, District Judge.

Regional Director of the Thirty–Second Region of the National Labor Relations Board (NLRB) William A. Baudler, for and on behalf of the NLRB, petitions for an injunction against Respondent American Baptist Homes of the West pursuant to section 10(j) of the National Labor Relations Act (NLRA), 29 U.S.C. § 160(j). Respondent opposes the petition. The petition was heard on June 30, 2011. Having considered oral argument and the papers submitted by the parties, the Court GRANTS Petitioner's request.

## BACKGROUND

In July and August 2010, Service Employees International Union, United Healthcare Workers—West brought multiple unfair labor practice charges against Respondent. The Union contended that Respondent violated section 8(a)(1), (3) and (5) of the NLRA, 29 U.S.C. § 158(a)(1), (3) and (5). Based on these charges, on March 24, 2011, the Acting General Counsel of the NLRB brought a complaint against Respondent. Unless otherwise stated, the facts below are from the record developed in the administrative proceedings initiated by the Acting General Counsel.[1]

Respondent operates the Piedmont Gardens senior living community, located in Oakland, California. The facility provides assisted living and skilled nursing services to approximately 300 residents. The Union represents between 100 and 125 employees in Piedmont Gardens's nursing, dietary, resident service, and "general and administration" departments. EX 754; Morgenroth Decl. ¶ 7.

In February 2010, members of the Union's bargaining committee began negotiations with Respondent for a new collective bargaining agreement (CBA). The most recent CBA was set to expire on April 30, 2010. The parties were not able to conclude a new CBA by June 2010.

On June 17 and 18, 2010, the Union conducted a strike authorization vote in Piedmont Gardens's employee break room. While the vote was being held, Piedmont Gardens's Executive Director Gayle Reynolds asked three Union-member employees, who were assisting with the vote, to leave the premises. On June 17, Reynolds asked Sheila Nelson, an employee and bargaining committee member, to leave. The following morning, Reynolds asked Faye Eastman and Geneva Henry, two Union-member employees, to leave. Ultimately, the employees voted to authorize the bargaining committee to call a strike if the committee believed it to be necessary.

---

1. All citations to the administrative hearing record bear the prefix "EX."

In ejecting Nelson, Eastman and Henry, Reynolds relied on the facility's so-called "No–Access Rule," which provides:

Employees may not clock-in for duty before their shift begins, nor are they to remain on the grounds after the end of their shift, unless previously authorized by their supervisor. Employees must have supervisor authorization before working/incurring overtime.

EX 935, 952. According to Reynolds, Respondent does not "generally police the employees" with respect to the rule, but instead "expect[s] them to follow" it. EX 384:18–19. Reynolds could recall only one instance, before the strike vote, when the rule had been enforced. Indeed, before June 2010, Nelson had attended at least two to three Union meetings in the break room. Sanjanette Fowler, another employee and member of the bargaining committee, likewise conducted Union business "numerous times" on the premises on her days off. EX 220:22.

On July 9, 2011, after a fruitless negotiating session, the bargaining committee called for a strike. In a letter dated July 9, 2010, the Union informed Reynolds that members "will commence a strike at 5:00 a.m. on Monday, August 2, 2010 and continue such activity unless and until a mutually agreeable resolution has been reached." EX 991. In a separate letter dated July 9, 2010, the Union stated, "All employees participating in the Unfair Labor Practice strike and withdrawal of labor at Piedmont Gardens are scheduled to begin at 5:00 AM on Monday, August 2, 2010 unconditionally offer to return to work at or after 5:00 AM on Saturday, August 7, 2010." EX 993.

On August 2, 2010, approximately eighty Union-member employees went on strike; roughly twenty Union-member employees stayed on the job. Respondent hired approximately sixty to seventy temporary workers and, by the evening of August 2, it believed that it had sufficient personnel to get through the strike. Beginning on August 3, Respondent began making permanent offers of employment to the temporary employees. It continued to do so on each day of the strike, even though the Union had reaffirmed by fax its previous unconditional offer to have members return to work "at or after 5:00 AM on Saturday, August 7, 2010." EX 366–67, 993. With respect to the newly-hired employees, Reynolds stated,

I knew that it would take time to acclimate the new employees to Piedmont Gardens, but the more important consideration for me was that I knew that those replacements would come to work if there was another work stoppage. I assumed that because these people were willing to work during this strike, they'd be willing to work during the next strike.

EX 360:10–17.

During the evening of August 6, 2011, the last day of the strike, the Union's attorney Bruce Harland and Respondent's attorney David Durham conversed by telephone about the replacement of strikers. Harland contends that Durham told him that Respondent intended to "permanently replace about 20 or so employees" because "Piedmont Gardens wanted to teach the strikers and the Union a lesson." EX 203:8–9, 24–25. Durham disputes Harland's recollection of their conversation. Durham recalls telling Harland that twenty to twenty-five Union-member employees would be permanently replaced, but asserts that he did not state that the intent was "to teach the strikers and the Union a lesson." Instead, Durham maintains that he stated, "Bruce, we all know permanent replacements happen in strikes." EX 588:15–16.

Respondent extended forty-four offers of permanent employment during the strike. As a result, thirty-eight of the approximately eighty strikers were denied reinstatement to their original positions. Since then, Respondent has offered thirty of the thirty-eight "substantially equivalent or alternative positions."[2] Morgenroth Decl. ¶ 9. However, it has reinstated only thirteen Union strikers to their original positions.

In an affidavit dated March 15, 2011, Myriam Escamilla, the Union's Nursing Home Division Director, asserts that "the Union has lost the support of the members who went back to work." EX 1004. She notes that no more than two presently-working Union members at Piedmont Gardens attended "two pickets and several candlelight vigils at the facility in support of the replaced strikers." *Id.* She also points to the absence of any presently-working Union members at a luncheon at the Union hall intended to "rebuild camaraderie among the members." *Id.* Finally, Escamilla contends that, as of the date of her affidavit, the "Union hasn't filed a single grievance since the strike." EX 1005. Respondent disputes this point with evidence that, on February 7, 2011, the Union presented it with a grievance by Matilda Imbukwa, a Piedmont Gardens employee.

A new CBA has yet to be concluded. In its absence, Respondent continues to follow the expired CBA.

Petitioner seeks an injunction, to be in effect pending the disposition of the NLRB proceedings, that enjoins Respondent from:

(1) Maintaining and enforcing a rule denying off-duty employees access to its premises for union activity while allowing off-duty employee access to its premises for other reasons;

(2) Refusing to reinstate employees to their former positions of employment because the employees joined or assisted the Union including participating in a strike, or because they engaged in other protected concerted activities for the purpose of collective bargaining or other mutual aid or protection;

(3) In any like or related manner interfering with, restraining or coercing its employees in the rights guaranteed them under Section 7 of the Act.

He also requests that the injunction provide the following forms of affirmative relief, among others: (1) rescission of the Respondent's "discriminatory policy of denying off-duty employees access to its premises for union activity;" and (2) offering Union-member employees reinstatement to "their former positions and previous wages and working conditions."

## DISCUSSION

█ Under section 10(j) of the NLRA, the NLRB may petition "any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order." 29 U.S.C. § 160(j). Section 10(j) authorizes a court to issue an injunction if doing so would be "just and proper." *Id.* In rendering its decision, a court must keep "in mind that the underlying purpose of Section 10(j) is 'to protect the integrity of the collective bargaining process and to preserve the Board's remedial power while it processes the charge.'" *McDermott v. Ampersand Publ'g, LLC,*

---

**2.** Respondent defines "substantially equivalent" to mean "positions with identical titles, employment status, and shifts." Morgenroth Decl. ¶ 8.

593 F.3d 950, 957 (9th Cir.2010) (quoting *Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 455 (9th Cir.1994), *abrogated in part by, Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)).

■■■■ Courts apply "the traditional equitable criteria used in deciding whether to grant a preliminary injunction" when determining whether to grant a section 10(j) injunction. *McDermott*, 593 F.3d at 957. Thus, to obtain a section 10(j) injunction, Petitioner must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." 129 S.Ct. at 374. Alternatively, "a preliminary injunction could issue where the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in" Petitioner's favor, so long as Petitioner also demonstrates a likelihood of irreparable harm and that preliminary relief is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir.2011).[3]

## A. Likelihood of Success on the Merits

■■ "On a § 10(j) petition, likelihood of success is a function of the probability that the Board will issue an order determining that the unfair labor practices alleged by the Regional Director occurred and that [a reviewing appellate court] would grant a

3. Respondent suggests that *Cottrell* does not apply to this case because it was an "environmental case." Opp'n at 16 n. 10. This is unpersuasive. *Winter*, on which *McDermott* relies, was, like *Cottrell*, a case involving claims under the National Environmental Policy Act of 1969.

4. The parties previously disputed the effect of *Winter* on *Miller*. *Frankl*, which was decided

petition enforcing that order, if such enforcement were sought." *Frankl ex rel. NLRB v. HTH Corp.*, 650 F.3d 1334, 1355–56, 2011 WL 3250637, at *16 (9th Cir. 2011).[4] The Ninth Circuit recently explained in *Frankl*,

[I]n evaluating the likelihood of success, "it is necessary to factor in the district court's lack of jurisdiction over unfair labor practices, and the deference accorded to NLRB determinations by the courts of appeals." It is, after all, the Board and not the courts, which "has primary responsibility for declaring federal labor policy." Additionally, and for similar reasons, "even on an issue of law, the district court should be hospitable to the views of the General Counsel, however novel." Given these considerations, it remains the case—whether or not the Board itself approved the filing of the § 10(j) petition—that the regional director in a § 10(j) proceeding "can make a threshold showing of likelihood of success by producing some evidence to support the unfair labor practice charge, together with an arguable legal theory."

*Id.* at 1356, at *16 (quoting *Miller*, 19 F.3d at 460).

### 1. Application of No–Access Rule During Strike Vote

■■ Petitioner contends that Reynolds's expulsion of Nelson, Eastman and Henry during the June 2010 strike authorization vote, based on Respondent's No–Access Rule, violated section 8(a)(1) of the NLRA.

subsequent to *McDermott* and *Small v. Operative Plasterers' Int'l Ass'n*, 611 F.3d 483 (9th Cir.2010), addresses this question. Although the mandate in *Frankl* has not yet issued, the decision "is nevertheless final for such purposes as stare decisis, and full faith and credit, unless it is withdrawn by the court." *Wedbush, Noble, Cooke, Inc. v. SEC*, 714 F.2d 923, 924 (9th Cir.1983).

This section prohibits interfering with, restraining, or coercing employees in the exercise of their collective bargaining rights under section 7 of the Act. 29 U.S.C. § 158(a)(1).

■ "An employer has a basic property right to regulate and restrict employee use of company property." *Guard Publ'g Co.,* 351 NLRB 1110, 1114 (2007) (citation and internal quotation marks omitted). However, "in enforcing its rules," an employer "may not discriminate against Section 7 activity." *Id.* at 1117. Under NLRB precedent, "unlawful discrimination consists of disparate treatment of activities or communications of a similar character because of their union or other Section 7–protected status." *Id.* at 1118.

The evidence supports a conclusion that this charge likely will be sustained. The record demonstrates that Respondent seldom enforced the No–Access Rule, which permits a reasonable inference that Reynolds singled out Nelson, Eastman and Henry for expulsion because they were facilitating the strike authorization vote. Respondent offers no other reason why the No–Access Rule was enforced on this particular occasion. Although Respondent may have previously permitted off-duty Union-member employees to participate in Union-related activities in the break room, this does not extinguish the likelihood that discriminatory enforcement will be found in this case.

Accordingly, the Court concludes that there is a likelihood of success on the charge based on Nelson's, Eastman's and Henry's ejection. Injunctive relief ordered by the Court based on this charge will be directed at Respondent's discriminatory enforcement of the No–Access Rule. *See Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust,* 636 F.3d 1150, 1160 (9th Cir.2011) (stating that "injunctive relief ... must be tailored to remedy the *specific harm alleged* ") (citation and internal quotation and editing marks omitted; emphasis in original).

### 2. Failure to Reinstate Striking Employees

■ Petitioner asserts that Respondent's failure to reinstate Union-member employees who participated in the August 2010 strike to their previous positions violated section 8(a)(3), which prohibits an employer from engaging in "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). Respondent counters that it was entitled to deny reinstatement based on *NLRB v. Mackay Radio & Telegraph Co.,* 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). *Mackay* and its progeny provide that it is not an unfair labor practice for an employer not to reinstate employees involved in a strike over economic conditions[5] so long as it has a legitimate and substantial business justification; such a justification is the hiring of permanent replacement employees. *See Mackay,* 304 U.S. at 345–46, 58 S.Ct. 904; *NLRB v. Fleetwood Trailer Co.,* 389 U.S. 375, 378, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967).

Petitioner does not dispute that the August 2010 strike was an economic one. Instead, he cites *Hot Shoppes, Inc.,* 146 NLRB 802 (1964), which he contends provides an unlawful-purpose exception to the *Mackay* rule. There, the NLRB construed *Mackay* to provide an employer with "a legal right to replace economic strikers at will" and to hold "that the

---

**5.** In contrast, employees "striking in protest of an employer's unfair labor practices" are entitled to reinstatement upon an unconditional offer to return to work. *NLRB v. Int'l Van Lines,* 409 U.S. 48, 51, 93 S.Ct. 74, 34 L.Ed.2d 201 (1972).

motive for such replacements is immaterial, absent evidence of an independent unlawful purpose." 146 NLRB at 805. Respondent contends that *Hot Shoppes* does not provide an exception to *Mackay* and that its discussion of an independent unlawful purpose is dicta.

Since *Hot Shoppes*, other NLRB and federal court decisions have acknowledged an unlawful-motive exception to the *Mackay* rule. In a 2004 decision, the NLRB stated that, although "an employer's motive for hiring permanent replacements is immaterial," a violation of the NLRA "will still lie if it is shown that, in hiring the permanent replacements, the employer was motivated by 'an independent unlawful purpose.'" *Church Homes, Inc. d/b/a Avery Heights*, 343 NLRB 1301, 1305 (2004), *vacated on other grounds by, New England Health Care Employees Union v. NLRB*, 448 F.3d 189 (2d Cir.2006). The Second Circuit vacated the 2004 *Avery Heights* decision because it reflected an unwarranted inference by the NLRB. *New England Health Care Employees Union*, 448 F.3d at 193. However, the court reiterated that the NLRA "is violated if 'an independent unlawful purpose' motivated the hiring of permanent replacements." *New England Health Care Employees Union*, 448 F.3d at 192 (citing *Hot Shoppes* ); *see also Indep. Fed. of Flight Attendants v. Trans World Airlines, Inc.*, 1989 WL 60281, at *3 (W.D.Mo.) (noting that the "independent unlawful purpose" exception provides "a minuscule loophole in the *Hot Shoppes* rule").

■ While no precedential case has applied the unlawful-motive exception,[6] as Respondent notes, this does not bar its application. The *Hot Shoppes* exception is not inconsistent with *Mackay* or its progeny, as Respondent suggests. As noted above, Supreme Court precedent provides that an employer may deny economic strikers reinstatement only if it has a legitimate and substantial business reason. An independent unlawful purpose is not a legitimate and substantial business reason. Respondent cites *Belknap, Inc. v. Hale*, 463 U.S. 491, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983), to assert that "the Supreme Court rejected an argument that an employer may not hire permanent replacements unless the employer could prove that it was 'necessary to secure the manpower to keep the business operating.'" Opp'n at 17:13–15 (emphasis omitted). However, *Belknap* did not concern the scrutiny applicable to an employer's decision to hire permanent replacements. *See Belknap*, 463 U.S. at 504 n. 8, 103 S.Ct. 3172 (stating that this "issue is not posed in this case"). Further, Petitioner does not argue that Respondent has the burden of proof. He acknowledges that the Acting General Counsel carries the burden to show that Respondent had an independent unlawful purpose when it hired permanent replacements.

Petitioner proffers sufficient evidence of an independent unlawful purpose. First, he points to Reynolds's comment that "the more important consideration" for her was "that because [the replacements] were willing to work during this strike, they'd be willing to work during the next strike." A fact-finder could reasonably infer from this statement that Reynolds specifically sought to replace strikers with individuals who would not vote to strike in the future.

6. On remand, the NLRB applied the exception in the *Avery Heights* case under its law-of-the-case doctrine. *See* 350 NLRB 214, 214 (2007). However, "'Law of the Case' decisions do not represent the general position of the Board and are not binding authority on administrative law judges in cases other than the single specific case under discussion." *Raley's Inc.*, 311 NLRB 1244, 1249 n. 7 (1993).

This inference is bolstered by the fact that Respondent continued to hire permanent replacements during the strike, even though the Union reaffirmed the strikers' unconditional commitment to return to work on August 7.[7]

■ Petitioner also cites Harland's disputed assertion that Durham told him that, by permanently replacing the strikers, Respondent wanted to teach a lesson to the striking employees and the Union. Durham strenuously contests Harland's account of their conversation. However, a "conflict in the evidence does not preclude the Regional Director from making the requisite showing for a section 10(j) injunction." *Scott ex rel. NLRB v. Stephen Dunn & Assocs.*, 241 F.3d 652, 662 (9th Cir.2001), *abrogated on other grounds by, Winter*, 129 S.Ct. at 375–76. If credited by a fact-finder, Harland's account would demonstrate an improper purpose in hiring permanent replacements.

Respondent contends that, even if the Court were to accept Petitioner's interpretation of Reynolds's statement and credit Harland's recollection, an independent unlawful purpose has not been shown. Respondent argues that such a purpose requires an "unlawful objective that is extrinsic to the strike." Opp'n at 20. However, it cites no authority to support this interpretation. Even if an extrinsic objective were required, Reynolds's statement and Durham's alleged comment could be viewed as reflecting Respon-

dent's intention to oust the Union. Such a purpose would be extrinsic to the strike.

Consequently, the Court concludes that the NLRB is likely to sustain the charge based on Respondent's failure to reinstate the striking Union-member employees. Petitioner presents an arguable legal theory supported by the evidence.

B. Likelihood of Irreparable Harm

■ While "a district court may not presume irreparable injury with regard to likely unfair labor practices generally, irreparable injury is established if a likely unfair labor practice is shown along with a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief." *Frankl*, 650 F.3d at 1362, 2011 WL 3250637 at \*22. A "likelihood of success as to a § 8(a)(3) violation with regard to union activists that occurred during contract negotiations or an organizing drive largely establishes likely irreparable harm, absent unusual circumstances." *Id.* at 1363, at \*23.

■ Petitioner relies primarily on Escamilla's affidavit to argue that the Union and its members at Piedmont Gardens are likely to suffer irreparable harm with respect to Respondent's failure to reinstate all of the strikers. He contends that the significant drop in employee support of the Union hampers its ability to bargain. He asserts that reinstating all of the strikers is necessary to reassure current employees that they may support the Union without fearing retaliation by Respondent. Re-

---

7. Respondent contends that it was not certain that the striking employees would resume work on August 7th as promised because the Union stated in one letter that the strike would continue "unless and until a mutually agreeable resolution has been reached." However, Respondent's concern is belied by a letter, sent the same day, that stated that the employees "unconditionally offer to return to work at or after 5:00 AM on Saturday, August 7, 2010." Reynolds admitted that this unconditional offer was also faxed to Piedmont Gardens during the strike. Respondent insists that the unconditional offer was open-ended because it stated that the employees would resume work "at or after 5:00 AM." Despite its purported confusion about this point, Respondent never contacted the Union to clarify the meaning of the letter.

spondent argues that Escamilla's affidavit must be discounted in its entirety because it contains hearsay and is based on speculation, not personal knowledge. Respondent also notes Petitioner's delay in seeking a section 10(j) injunction.

Escamilla, as Director of the Union's Nursing Home Division, likely has personal knowledge of member participation in the Union-sponsored luncheon, pickets and candlelight vigils and of the presently-stalled bargaining process. She asserts that, before the August 2010 strike, approximately eighty to ninety percent of Union-member employees participated in pickets. Respondent does not contest this figure or that, at most, two presently-working Union members have participated in Union activities since the strike. Nor does Respondent dispute Escamilla's contention that the parties have not negotiated since August 17, 2010, when Respondent proposed lower wages and an open-shop arrangement. Respondent contends that Escamilla fails to show a causal link between the diminished support for the Union and Respondent's alleged unfair labor practices. However, it is reasonable to assume that Respondent's ejection of Union-member employees from the premises during the strike authorization vote and refusal to reinstate strikers have chilled member engagement.

■ That Petitioner did not seek a section 10(j) injunction until two months after the Acting General Counsel filed his complaint against Respondent does not suggest that irreparable harm is not likely to occur. Indeed, Petitioner sought an injunction shortly after the administrative proceedings concluded. Further, delay, on its own, "is not a determinative factor in whether the grant of interim relief is just and proper." *McDermott*, 593 F.3d at 965 (citation and internal quotation marks omitted). Respondent points to no other

factors, viewed together with Petitioner's brief delay, that show an injunction to be inappropriate.

As noted above, the purpose of section 10(j) is to protect the integrity of the collective bargaining process. Petitioner marshals sufficient evidence that Respondent's alleged unlawful conduct has harmed Union-member employees' ability to bargain collectively. Consequently, the Court concludes that Petitioner has met his burden to show a likelihood of irreparable harm with respect to Respondent's failure to reinstate all of the strikers.

C. Balance of Equities

■ Petitioner contends that the equities weigh in favor of issuing an injunction because, without interim relief, the Union will be unable to bargain collectively and advance employees' interests. Respondent asserts that the equities weigh in its favor because, if required to reinstate all strikers, it "will have more employees than positions available." Opp'n at 27:19. It suggests that it will have to make additional unemployment insurance payments, which would hurt its business.

■ When "considering the balance of hardships, the district court must take into account the probability that declining to issue the injunction will permit the allegedly unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority." *Miller*, 19 F.3d at 460. Here, approximately 100 to 125 represented employees have worked without a new CBA for over a year, and Petitioner has proffered evidence suggesting that Respondent's alleged unlawful labor practices have interfered with the collective bargaining process. Although Respondent complains that the permanent replacements may be harmed if an injunction is granted, the record suggests that any harm stems

from Respondent's decisions that were motivated by an independent unlawful purpose. Absent interim relief, the chilling effect of Respondent's conduct will not be dissipated. Further, the remaining strikers who have not been reinstated may seek other employment, rendering moot relief by the NLRB.

Accordingly, the Court concludes that the equities favor the entry of an injunction.

### D. Public Interest

■ "In § 10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge. Thus, courts must consider the extent to which this interest is implicated under the circumstances of the particular case." *Miller*, 19 F.3d at 460. Here, based on the facts of this case, the Court finds that interim relief is in the public interest. Respondent does not argue otherwise.

### CONCLUSION

■ For the foregoing reasons, the Court GRANTS Petitioner's request for a section 10(j) injunction. An injunction will issue as a separate order.

The Court stays the injunction for fourteen days so that Respondent may seek a stay from the Ninth Circuit. If the Ninth Circuit does not grant a stay within this period, Respondent shall comply with the injunction and offer interim reinstatement to the affected employees within fourteen days of the date the stay period expires.

IT IS SO ORDERED.

Based upon the entire record before the Court, it is hereby ORDERED, ADJUDGED AND DECREED that, pending the final disposition of The Matter of American Baptist Homes of the West, do-

ing business as Piedmont Gardens, and Service Employees International Union, United Healthcare Workers–West, presently before the National Labor Relations Board (NLRB), the Petition for Temporary Injunction hereby is granted in the manner specifically set forth below:

Respondent, its officers, representatives, agents, servants, employees and all persons acting on its behalf are:

A. Enjoined and Restrained from:

(1) Enforcing the No–Access Rule in a discriminatory fashion;

(2) Refusing to reinstate employees to their former positions of employment because the employees joined or assisted the Union by, among other things, participating in a strike, or because they engaged in other protected concerted activities for the purpose of collective bargaining or other mutual aid or protection;

(3) In any like or related manner, interfering with its employees' rights guaranteed them under Section 7 of the National Labor Relations Act;

B. To take the following affirmative action:

(1) Enforce the No–Access Rule, if at all, in a non-discriminatory fashion;

(2) Within fourteen days of the date of this Order, offer interim reinstatement to Sherwin S. Amorsolo, Zegenech Bayou, Maggie Bellinger, Yohanes Beraki, Pacita Bumatay, Marieth Romero Carmona, Calvin Christian, Bonnie Conley, Judith Coston, Besima Ferhatovic, Sanjanette Fowler, Elisa Haile, Keiyana Kemp, Johnny Lee, Salvador Miranda, Michael Morrow, Sheila Nelson, Janie Ragsdale, Michelle Reynolds, Yordanos Sega, Paramjit Sekhon, Palwinder Singh, Denesha Singleton, Carmen Smith, Pierre

Williams, and Rosa Zelaya to their former positions and previous wages and working conditions; these individuals must respond within twenty-one days of receiving an offer, and Respondent must reinstate them within five days of acceptance of that offer;

(3) Within seven days of the issuance of this Order, post copies of this Order at Respondent's facility on bulletin boards or other conspicuous locations where notices to employees are typically posted, and grant agents of the NLRB access to Respondent's facility to monitor compliance with the posting requirements;

(4) Within forty-two days of the date of this Order, file with the Court, with a copy submitted to Petitioner, a sworn affidavit from a responsible official of Respondent, setting forth with specificity the manner in which Respondent has complied with this Order.

This injunction is STAYED for fourteen days so that Respondent may seek a stay from the Ninth Circuit. If the Ninth Circuit does not grant a stay within this period, Respondent shall comply with the injunction and offer interim reinstatement to the above-listed employees within fourteen days of the date the stay period expires.

IT IS SO ORDERED.