Douglas **SHEPHERD**, et al., Plaintiffs,

v.

**WELDON MEDIATION SERVICES, INC.**, et al., Defendants.

**Case No. C10–1217RAJ.**

United States District Court,
W.D. Washington,
at Seattle.

Feb. 9, 2011.

Allyson Grace O'Malley–Jones, Eric Dunn, Leticia Camacho, Northwest Justice Project, Seattle, WA, for Plaintiff.

James Ernest Fearn, Jr. Donald S. Means, Seattle Housing Authority Office of the General Counsel, Kristen Dorrity, Laura Hawes Young, Andrews Skinner, Seattle, WA, for Defendant.

## ORDER & PRELIMINARY INJUNCTION

RICHARD A. JONES, District Judge.

### I.  INTRODUCTION

This matter comes before the court on Plaintiffs' motion (Dkt. # 4) for a preliminary injunction and the motion (Dkt. # 27) of the United States Department of Housing and Urban Development ("HUD") to be dismissed as a party. Plaintiffs sought oral argument on their motion for an injunction. No other party requested oral argument. The court finds oral argument unnecessary. For the reasons stated herein, the court GRANTS Plaintiffs' motion and enters a preliminary injunction in Part IV of this order. The court GRANTS HUD's motion, and directs the clerk to dismiss HUD as a party.

Because this order "grant[s] or den[ies] an interlocutory injunction," the court must make findings and fact and conclusions of law. Fed.R.Civ.P. 52(a)(2). The court includes its findings and conclusions in this order, which serves as a memorandum of the court's decision. Fed.R.Civ.P. 52(a)(1) (permitting findings and conclu-

sions within "an opinion or a memorandum of decision"); *see also FTC v. H.N. Singer, Inc.,* 668 F.2d 1107, 1109 (9th Cir.1982) (noting that explicit factual findings are unnecessary).

### II.  BACKGROUND

Plaintiffs Douglas Shepherd, Patricia Ann, Khadija Bin, and Komba Ngauja are tenants in housing complexes that Defendant Seattle Housing Authority ("SHA") administers. The other Plaintiff is the Resident Action Council ("RAC") a non-profit organization representing a broad spectrum of SHA tenants.

SHA is a public housing agency within the meaning of the United States Housing Act of 1937 ("Housing Act"), which is codified along with amendments beginning at 42 U.S.C. § 1437. SHA administers more than 6000 housing units for low-income residents. SHA manages other housing programs as well, including the Section 8 Housing Choice Program ("Section 8"), in which qualified persons are awarded a voucher that they use to subsidize market-rate rentals of privately-owned housing units. This case, however, focuses on tenants in low-income housing units that SHA owns and manages.

When disputes arise between tenants and a public housing agency, the Housing Act mandates that the agency provide tenants an opportunity to file grievances contesting any adverse action. 42 U.S.C. § 1437d(k).[1] An agency-appointed officer must hear and decide those grievances. *Id.* In its later analysis, the court will examine in detail the hearing officer's role and the legal constraints on that role.

Lawrence Weldon hears many grievances for SHA. He is the principal of

---

1. With HUD approval, housing agencies can exempt from the grievance process certain adverse actions in response to a tenant's criminal activity or threats to the safety of residents. 42 U.S.C. § 1437d(k); 24 C.F.R. § 966.51(a)(2), § 966.53(c). That exemption is not at issue in this dispute.

Weldon Mediation Services, Inc., and he is its sole employee. Mr. Weldon has regularly acted as a hearing officer for SHA grievances since August 2002. Weldon Depo. at 9.[2] As a result of a consent decree in another lawsuit, *Hendricks v. SHA* (No. C07–657TSZ, W.D. Wash., consent decree entered Jun. 9, 2008), Mr. Weldon no longer hears grievances challenging SHA's termination of Section 8 vouchers.[3] There is no dispute that he hears the vast majority of SHA grievances that do not involve the termination of Section 8 vouchers. He estimates that he has heard "dozens, if not hundreds" of SHA grievances. Weldon Decl. ¶ 7. As of October 2009, he presided over one to three grievances each week. Weldon Depo. at 61. There is no dispute that the majority of the work that Mr. Weldon performs is as an SHA hearing officer.

Mr. Weldon is a professionally certified mediator. Before he started his mediation business, he served as a union officer, and was involved in hundreds of union grievances over a ten-year span. Weldon Decl. ¶ 1. Mr. Weldon has a master's degree in public administration. He is not an attorney, and he has had no formal legal training.

There is no evidence that SHA considered outside input before appointing Mr. Weldon as a hearing officer. It appears that he last entered a formal contract with SHA in 2005. Dunn Decl. (Dkt. # 4–6), Att. A. So far as the record reflects, SHA is free to terminate its relationship with Mr. Weldon.

In the past several years, the RAC (with the assistance of its current counsel) has contacted SHA to express its belief that Mr. Weldon should not be a hearing officer. In two 2010 letters, RAC raised many of the contentions that form the basis of this lawsuit: that Mr. Weldon lacks the training, education, and impartiality that the RAC believes a hearing officer should have. Dunn Decl. (Dkt. # 4–6), Att. D–1, D–2. SHA has responded by letter, considering the RAC's assertions, but retaining Mr. Weldon nonetheless. *Id.*, Att. C–1.

The record contains eight of Mr. Weldon's written post-hearing grievance decisions. *Id.*, Att. B–1 through B–6; Att. E–1; O'Malley–Jones Decl. (Dkt. # 4–7), Ex. C. The court has reviewed each of them. They are between three and seven pages long. They follow a consistent format wherein Mr. Weldon states the date of the hearing, the issue presented, a statement of relevant SHA policies, a summary of the substance of the grievance, a list of all documents he considered at the hearing, a synopsis of every witness's testimony, and his own findings and conclusions. The court will discuss his decisions in greater detail in its later analysis. For now, it suffices to note that the evidence shows that Mr. Weldon conducts the hearings in a reasonable manner, and makes a reasonable effort to apprise hearing participants not only of his decision, but of the evidence underlying the decision as well as his interpretation of that evidence.

Plaintiffs move for a preliminary injunction that would prohibit Mr. Weldon from presiding over further SHA grievance hearings. They contend that Mr. Weldon lacks the qualifications to serve as a hearing officer. They contend that he ignores

---

**2.** Mr. Weldon has been deposed at least twice in his role as an SHA hearing officer. Unless otherwise noted, the court cites the transcript of his October 21, 2009 deposition in *SHA v. Powell*, No. 09–2–07487–9SEA (King Cnty. Sup.Ct.). Dkt. # 4–3, Ex. 2.

**3.** Although Mr. Weldon no longer hears grievances over SHA's termination of Section 8 vouchers, he occasionally hears Section 8 grievances that do not involve voucher termination. Weldon Depo. at 30, 116.

or refuses to apply applicable law when resolving grievances. They contend that he is biased in favor of the SHA, and is biased against certain attorneys who represent tenants in grievance hearings. They also contend that SHA appointed him in violation of law requiring the input of SHA resident organizations.

In a separate motion, HUD asks to be dismissed from this suit as a Defendant.

The court now turns to each motion.

## III. ANALYSIS

### A. Injunction Standard

The Ninth Circuit has retooled its long-enduring standard for preliminary injunctive relief in the wake of *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). The former Ninth Circuit standard included a sliding scale on which a movant could compensate for a lesser showing of harm by showing a correspondingly greater chance of success on the merits, and vice versa:

> Under the "traditional" criteria, a plaintiff must show (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). Alternatively, a court may grant the injunction if the plaintiff demonstrates either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor.

*NRDC v. Winter,* 518 F.3d 658, 677 (9th Cir.2008) (citation omitted). In *Winter,* the Supreme Court rejected the Ninth Circuit standard to the extent that it made injunctive relief available on a showing of a mere possibility of irreparable harm. 129 S.Ct. at 375. Some subsequent Ninth Cir-

cuit panels used broad language about the effect of *Winter* on the alternative standard for injunctive relief. *See, e.g., Stormans, Inc. v. Selecky,* 586 F.3d 1109, 1126–27 (9th Cir.2009) (noting that "[t]o the extent that our cases have suggested a lesser standard [than the one established in *Winter* ], they are no longer controlling, or even viable.") (quoting *Am. Trucking Ass'ns, Inc. v. City of Los Angeles,* 559 F.3d 1046, 1052 (9th Cir.2009)). The panel in *Alliance for the Wild Rockies ("Alliance") v. Cottrell* took a narrow view of *Winter.* 632 F.3d 1127 (9th Cir.2011), *withdrawing op. at* 613 F.3d 960, 2010 WL 2926463 (9th Cir.2010) *and amended at* 622 F.3d 1045 (9th Cir.2010). After reviewing the post-*Winter* landscape in the Ninth Circuit and in other circuits with sliding-scale injunction standards, *id.* at 1131–34, the *Alliance* panel "conclude[d] that the 'serious questions' version of the sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision in *Winter.*" *Id.* at 1134. The "serious questions version of the sliding scale test" requires the movant to demonstrate that "serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Id.* (quoting *Lands Council v. McNair,* 537 F.3d 981, 987 (9th Cir.2008) (en banc)). The *Alliance* panel explained that the serious questions test survives, so long as the plaintiff "make[s] a showing on all four prongs" of the *Winter* test. *Id.*

This court according applies the following test for a preliminary injunction, consistent with *Winter* and *Alliance.* The court may issue a preliminary injunction where a party establishes (1) a likelihood of success on the merits, that (2) it is likely to suffer irreparable harm in the absence of preliminary relief, that (3) the balance of hardships tips in its favor, and (4) that the public interest favors an injunction. *Id.* at 1131, *Winter,* 129 S.Ct. at 374. A

party can also satisfy the first and third elements of the test by raising serious questions going to the merits of its case and a balance of hardships that tips sharply in its favor. *Alliance*, 632 F.3d at 1134–35.

## B. The Law Provides Procedural and Substantive Rules For Grievances.

Before considering Plaintiffs' likelihood of success on the merits, the court examines the law that governs the merits of Plaintiffs' claims. Although Plaintiffs occasionally cite precedent invoking the Due Process Clause of the Constitution, they do not raise a Due Process Clause challenge. Rather than contending that either the SHA or the regulations that govern the SHA violate the Constitution, Plaintiffs contend that the SHA and Mr. Weldon violate the statutes and regulations that govern SHA grievances.

The court begins with the statutory framework for grievance procedures. The Housing Act empowers the HUD Secretary to craft those procedures, subject to minimum requirements:

The Secretary shall by regulation require each public housing agency receiving assistance under this chapter to establish and implement an administrative grievance procedure under which tenants will-

(1) be advised of the specific grounds of any proposed adverse public housing agency action;

(2) have an opportunity for a hearing before an impartial party upon timely request within any period applicable under subsection (*l*) of this section;

(3) have an opportunity to examine any documents or records or regulations related to the proposed action;

(4) be entitled to be represented by another person of their choice at any hearing;

(5) be entitled to ask questions of witnesses and have others make statements on their behalf; and

(6) be entitled to receive a written decision by the public housing agency on the proposed action.

42 U.S.C. § 1437d(k).

The Secretary has exercised HUD's statutory authority in eight regulations. 24 C.F.R. §§ 966.50–966.57. With exceptions not applicable here, *see supra* n. 1, every tenant is entitled to file a grievance within a "reasonable time" of "any PHA action or failure to act involving the tenant's lease with the PHA or PHA regulations which adversely affect the individual tenant's rights, duties, welfare or status." 24 C.F.R. § 966.50. Each PHA must adopt its own grievance procedures, must incorporate those procedures in every tenant's lease, must provide a copy of the grievance procedure to tenants and residential organizations, and must provide notice and an opportunity to comment before changing the grievance procedure. 24 C.F.R. § 966.50. SHA has its own grievance procedure manual ("SHA Gr. Man."). Dkt. # 18–2. In large part, the SHA manual reproduces the language of HUD regulations.

Every tenant filing a grievance is guaranteed a "fair hearing." 24 C.F.R. § 966.56(b). A tenant can review any PHA document relevant to the grievance in advance of the hearing. 24 C.F.R. § 966.56(b)(1). The tenant can, at his own expense, have an attorney or other person represent him. 24 C.F.R. § 966.56(b)(2). The tenant has a right to confront witnesses, although rules of evidence governing judicial proceedings do not apply. 24 C.F.R. § 966.56(b)(4), 24 C.F.R. § 966.56(f).

The hearing officer has obligations as well. He or she must decide the grievance "based solely and exclusively on the facts

presented at the hearing." 24 C.F.R. § 966.56(b)(5). He or she must be impartial. 24 C.F.R. § 966.55(b)(1). SHA guarantees not merely an "impartial person," but one who does not "appear to lack impartiality." SHA Gr. Man., Implementing Policy, ¶ B. The hearing officer must issue a "written decision, together with the reasons therefor, within a reasonable time after the hearing." 24 C.F.R. § 966.57(a). The SHA requires a written decision within 10 business days of the hearing. SHA Gr. Man., Implementing Policy, ¶ H.[4] The officer's decision binds the housing agency, unless the agency determines that the decision is either "contrary to applicable Federal, State or local law," or that it does not resolve a dispute to which the grievance procedure applies. 24 C.F.R. § 966.57(b)(1)-(2). According to Mr. Weldon, the SHA has never disregarded one of his grievance decisions. Weldon Depo. at 52.

Each housing agency is responsible for selecting its hearing officers. As previously noted, an officer must be impartial. 24 C.F.R. § 966.55(b)(1). A hearing officer may be an employee of the housing agency. 24 C.F.R. § 966.55(b)(2)(ii). A housing agency must "consult the resident organizations" before appointing every hearing officer. 24 C.F.R. § 966.55(b)(3). SHA's manual does not include a consultation requirement. SHA Gr. Man., Procedure, ¶ C(1).

Both HUD regulations and the SHA manual are almost entirely silent as to the substantive constraints on the hearing officer's decisionmaking. The tenant can grieve any act that "adversely affect[s]" his "rights, duties, welfare, or status." 24 C.F.R. § 966.50. The regulations do not explain, however, which body or bodies of law confer rights on tenants. A tenant must make a preliminary showing of "an entitlement to the relief sought," 24 C.F.R. § 966.56(e), but nothing explains what law or laws give rise to such entitlements. SHA bears the burden of "proving that the resident violated the lease, Housing Authority policies, or other applicable rule or agreement...." SHA Gr. Man., Procedure, ¶ C(6)(h). No regulation explains what "other applicable rule[s]" apply.

Although the regulations are largely silent, case law establishes that tenants' substantive rights arise not only under federal law, but under applicable state and local law as well. *See Housing Auth. of Everett v. Terry,* 114 Wash.2d 558, 789 P.2d 745, 749–50 (1990) (holding that federal law did not preempt requirements of Washington Residential Landlord–Tenant Act ("RLTA") or Unlawful Detainer Act); *Housing Auth. of Seattle v. Silva,* 94 Wash.App. 731, 972 P.2d 952, 955 (1999) (finding SHA bound by Seattle Municipal Code). HUD regulations implicitly recognize that state and local law constrain the decisionmaking of hearing officers. 24 C.F.R. § 966.57(b)(2) (giving housing agency right to set aside decisions that are "contrary to applicable Federal, State or local law").

**C. Plaintiffs Are Likely to Succeed on The Merits of Some, But Not All, of Their Challenges to SHA Policy and Mr. Weldon's Actions as a Hearing Officer.**

Plaintiffs raise several distinct challenges to Mr. Weldon's role as a hearing officer. They contend that he is not impartial. They argue that he improperly excludes legal arguments from grievance hearings. They contend that he is not qualified to serve as a hearing officer.

---

4. Another section of the SHA manual requires a written decision within "seven working days," but permits extensions in "extenuating circumstances." SHA Gr. Man., Procedure, ¶ D(a).

They also claim that he has no authority to act because SHA did not consult with resident organizations. The court considers the likelihood of success on each challenge separately.

### 1. Plaintiffs are Not Likely To Succeed In Proving That Mr. Weldon is Biased.

Plaintiffs contend that a survey of Mr. Weldon's decisions reveal that he favors SHA, that he is biased because SHA did not consult resident organizations before selecting him as a hearing officer, and because he has demonstrated a bias against a particular legal organization.

The centerpiece of Plaintiffs' first allegation of bias is that a survey of Mr. Weldon's grievance rulings over the last three years reveals that in 73 grievances, he ruled in favor of SHA 67 times. The court finds this datum to be entirely meaningless as evidence of bias. Plaintiffs suggest that Mr. Weldon ruled too often in SHA's favor, but offer no evidence of how often he should have ruled in SHA's favor but for his alleged bias. Should he have ruled in SHA's favor 37 out of 73 times? 20? 52? On this record, no number is more meaningful than another. It is just as likely, based on Plaintiffs' evidence, that Mr. Weldon is biased in favor of tenants, because he ruled in their favor 6 times. It is just as likely, based on Plaintiff's evidence, that the SHA is careful not to take unlawful adverse actions against tenants, resulting in grievance rulings in their favor. The court has no idea which of these many possibilities accurately describes the circumstances, but neither do Plaintiffs. The notion that Plaintiffs can assess an adjudicator's bias based on such "statistics" is ludicrous. This court, for example, has resolved dozens of petitions for writs of habeas corpus over the past three years. It has never issued a writ of habeas corpus. Is this proof of this court's bias against persons convicted of crimes? By Plaintiffs' logic, the answer is "yes." The panel of attorneys who SHA now employs to resolve Section 8 voucher termination grievances (to much acclaim from Plaintiffs) has ruled in SHA's favor 36 out of 40 times. Todd Decl. (Dkt. #18–5) ¶¶ 4–5. By Plaintiffs' logic, these attorneys are almost as "biased" as Mr. Weldon, because they rule against tenants 90% of the time, whereas Mr. Weldon rules against tenants 91.8% of the time.

The court also finds no merit in the contention that Mr. Weldon is biased because SHA selected him without considering the input of resident organizations. The court will soon consider whether SHA's selection process complies with the law. Even if SHA did not follow the law, that legal shortcoming has no bearing on whether the hearing officer it selected was biased. A flawed selection process does not inevitably lead to a flawed selectee. No one could conclude that the selection process SHA used is evidence of bias in the hearing officer they selected.

Also unavailing is the contention that Mr. Weldon favors SHA because it provides the majority of his income. The law authorizes SHA to use its own officers and employees as grievance officers, even though SHA pays their salaries. 24 C.F.R. § 966.55(b)(2)(ii). Mr. Weldon is no more inherently biased because SHA pays him than an SHA employee in the same position. Put differently, to the extent that having SHA pay a hearing officer's salary creates an inherent risk of bias, the law does not permit a hearing officer to be removed because of that risk.

Plaintiffs also point to errors in Mr. Weldon's decisions as evidence of bias. At least one of those errors has been the subject of judicial proceedings. In a grievance that Plaintiff Khadija Bin brought, the King County Superior Court ordered a new hearing where Mr. Weldon deferred to SHA, rather than exercising his own

judgment, in denying a continuance. Dunn Decl. (Dkt. # 4–6), Att. E–2, E–3. Plaintiffs claim other errors as well. For example, they contend that Mr. Weldon erred by refusing to consider a request that he recuse himself from a grievance hearing, and that he regularly engages in ex parte contact.

The court finds no evidence of bias in Plaintiffs' allegations of error. Adjudicators make errors, errors for which appellate and other judicial remedies are available. Mr. Weldon no doubt makes errors as well. In at least one case, a court decided as much. Evidence of errors, even multiple errors, is no evidence of bias. Systematic repetition of an error identified by a reviewing court might be evidence of bias, or even frequent errors that favor a particular class of litigants. *In re Judicial Conduct and Disability,* 517 F.3d 558, 561 (U.S.Jud.Conf.2008) (requiring "clear and convincing evidence of an arbitrary and intentional departure from, or willful indifference to prevailing law" before finding misconduct based on systematic error). Plaintiffs do not present evidence of systematic error. Out of 73 grievance decisions that Mr. Weldon has rendered in the past three years, Plaintiffs have submitted eight of them for this court's review. Even if every one of them contained an error (they do not), they would reveal nothing about whether those errors were systematic. Plaintiffs are not likely to succeed in proving biased based on what they view to be Mr. Weldon's errors.

Unlike Plaintiffs' other allegations of bias, their assertion that Mr. Weldon is biased against the legal organization that represents them has at least some basis in evidence. That legal organization represented tenants in the *Hendricks* lawsuit, and the consent decree resolving that suit led to Mr. Weldon no longer hearing grievances over SHA's termination of Section 8

vouchers. It is likely that Mr. Weldon suffered a financial impact as a result. There is no reason, of course, to presume that any adjudicator is biased against an attorney who represented a client whose lawsuit led to an adverse impact on the adjudicator. Many adjudicators (most adjudicators, if the court were to hazard a guess) understand that there is no reason to hold an attorney responsible for a client's lawsuit. But in a case where an attorney has taken an active role on behalf of a client whose case led to an adverse financial impact on an adjudicator, there is at least a question about whether the adjudicator might be unable to act impartially in other cases in which the attorney is involved. That question becomes more complicated in a case like this one where an organization of numerous attorneys, rather than a particular attorney, is involved in representing the client. Were the *Hendricks* consent decree and its impact on Mr. Weldon Plaintiffs' only evidence, Plaintiffs would be unlikely to succeed in proving bias.

Mr. Weldon's deposition testimony, however, provides additional support for the notion that he bears a bias against attorneys from the legal organization representing Plaintiffs. He repeatedly made statements that suggest his displeasure with the organization and the attorney deposing him. Weldon Depo. at 31 ("[I]t was pretty well publicized in the media and you made it pretty well known that you felt that I was not competent to be a hearing officer, and I was informed that I was no longer going to do the Section 8 hearings because of your ideas of my incompetency."); *id.* at 76 ("That question is so ridiculous. I can't even begin to tell you how stupid that question is."); *id.* at 90–91 ("You know, this is the same way that you browbeat and harassed me on the first, during the first—these are the identical same questions and the same little attitude that you had in the first deposition. I'm

getting tired of it. I'm getting really tired of this kind of harassment."). When questioned about a request that the organization made that he recuse himself in one grievance hearing, his response also suggests displeasure. *Id.* at 92 ("Your agency did a little slam against me at the beginning of the hearing. I ignored them and got on with the real issue at hand, which I have no clue what this is. It's just obnoxious. It was just an obnoxious little statement they read and I ignored them. And, no, I did not recuse myself.").

Taken together, the evidence suggests at least a possibility of success on the merits in a challenge to Mr. Weldon's partiality in grievances where this legal organization represents the tenant. Before concluding that it was likely to succeed, however, the court would require additional evidence regarding the financial impact of the *Hendricks* consent decree on Mr. Weldon. It would also likely require live testimony from Mr. Weldon. Deposition testimony read from a transcript often creates a different impression than live or audio-recorded testimony. Accordingly, the court finds that at this stage, Plaintiffs have raised a possibility of success on the merits of this challenge, but no more.

Before moving away from Plaintiffs' challenges to Mr. Weldon's partiality, the court remarks that Plaintiffs appear far too eager to conflate their disappointment with the substance of Mr. Weldon's grievance decisions with proof of his supposed bias. Attacks on an adjudicator are the easy refuge of those who are disappointed with an adjudication. In complaints of judicial misconduct, those attacks are necessarily discarded. *See, e.g.,* 28 U.S.C. § 352(b)(1)(A)(ii) (directing chief judge to dismiss complaints against judges "directly related to the merits of a decision or procedural ruling"); *In re Judicial Conduct and Disability,* 517 F.3d at 561 (decrying use of "a misconduct proceeding to obtain redress for—or even criticism of—the merits of a decision with which a litigant or misconduct complainant disagrees"). The court discards Plaintiffs' merits-based attacks in this instance as well. The court cautions Plaintiffs and their counsel that their readiness to attribute flaws in the SHA grievance process to perceived flaws in Mr. Weldon himself only weakens their case.

### 2. Plaintiffs Are Likely To Succeed In Showing That SHA and Mr. Weldon Violate the Law By Not Considering Legal Arguments In Grievance Hearings.

■ The evidence reveals that SHA's policy is to refuse to consider legal arguments that tenants make at grievance hearings. The evidence before the court relates only to hearings over which Mr. Weldon presides, and it is possible that the choice to disregard legal arguments was initially Mr. Weldon's. There is no question, however, that SHA is aware of that choice, and has tacitly approved it for years. In letters responding to Plaintiffs' prelitigation efforts to address his practices, SHA appears to have approved that practice. Dunn Decl. (Dkt. # 4–6), Att. C–1, C–2. Accordingly, the court concludes that it is highly likely that a finder of fact would conclude that SHA policy, which Mr. Weldon executes, is to exclude virtually all legal arguments that tenants make at grievance hearings.

The "legal arguments" that SHA excludes are wide-ranging. If a tenant makes an argument based on the requirements of the RLTA, Mr. Weldon will not consider it:

Q: Did you consult the Washington Landlord–Tenant Act in reaching this decision?

A: Do I have to constantly answer this? I told you, sir, that I do not consider any arguments, any legal

arguments, and I consider them to be outside the scope of a simple informal grievance hearing.

Weldon Depo. at 102–03; *see also id.* at 107. He does not consider arguments based on the Seattle Municipal Code, the Fair Housing Act, the Americans with Disabilities Act, or the United States Constitution. *Id.* at 107–08. He has received no training on the requirements of these laws, *id.* at 33–40, and SHA has never attempted to provide such training. Mr. Weldon is familiar with SHA's grievance policy and with federal regulations that govern grievance procedure. As the court has noted, however, HUD regulations and SHA's grievance policy provide only procedural rules and standards, they do not address what substantive legal standards he should apply.[5]

The need for a hearing officer to consider tenants' legal arguments is apparent from reviewing Mr. Weldon's written decisions. Many of those decisions address SHA's decision to evict a tenant. SHA must follow Washington law to evict a tenant. Thus, when SHA begins the eviction process, it must provide the tenant with a statutorily authorized notice. The Unlawful Detainer Act governs the content of those notices and the manner of their service. RCW §§ 59.12.030, 59.12.040. A tenant who has failed to pay rent is entitled to a three-day notice to pay or vacate. RCW § 59.12.030(3). A tenant who has failed to comply with a condition of his or her lease is entitled to a ten-day notice to comply or vacate. RCW § 59.12.030(4). A tenant who has committed waste or maintained a nuisance at the properly is entitled to a three-day notice to vacate. RCW § 59.12.030(5). These notices are critical not only because they apprise the tenant of an imminent unlawful detainer action, but because in most instances they guarantee the tenant the right to avoid that action by curing the problem that led to the notice. SHA issues statutorily-required notices to tenants.

Although Unlawful Detainer Act notices are a critical step in the eviction process, Mr. Weldon will not consider whether SHA's notices comply with the Unlawful Detainer Act or the RLTA. Mr. Weldon's written decisions invariably cite the notice that SHA has served, and often conclude with a statement affirming the allegations of the notice. *E.g.,* Dunn Decl. (Dkt. # 4–6), Att. B–1 ("Based on the testimony and documentation presented in this particular case, the Three–Day Notice to Quit the Premises for Maintaining a Nuisances issued to [tenant] is appropriate."); O'Malley–Jones Decl. (Dkt. # 4–7), Ex. C ("The Seattle Housing Authority has acted appropriately in issuing [tenant] a Ten Day Notice to Comply or Vacate."). But if a tenant raises a defense based on the requirements of the UDA or the RLTA, Mr. Weldon will not consider it. For example, in one case, a tenant argued that the conduct of which he was accused was merely a violation of the lease, rather than a nuisance. Dunn Decl. (Dkt. # 4–6), Att. B–2 (Sept. 6, 2007 grievance decision). That argument is critical, because the UDA and RLTA do not permit SHA to evict a tenant for a lease violation without providing an opportunity to remedy the violation. The Seattle Municipal Code contains a "Just Cause Eviction" provision that additionally permits an eviction where the landlord has issued at least three ten-day comply-or-

---

5. HUD filed a response to SHA's opposition to Plaintiffs' injunction motion in which it rejected SHA's assertion that merely following HUD regulations suffices to comply with the law. Dkt. # 19 at 4 ("SHA has a duty not merely to adopt the HUD regulations in writing, but also to act in accordance with those regulations and federal and state law at all times.").

vacate notices in a twelve-month period. SMC § 22.206.160(C)(1)(d). For certain "nuisances," however, the SHA arguably need not provide the tenant an opportunity to cure. *Compare* RCW § 59.12.030(5), *with* RCW § 59.18.180(1) ("The tenant shall have a defense to an unlawful detainer action filed solely on this ground if it is determined at the hearing authorized under the provisions of chapter 59.12 RCW that the tenant is in substantial compliance with the provisions of this section."). Mr. Weldon noted the tenant's argument based on the Unlawful Detainer Act and the RLTA, but refused to consider it. Dunn Decl. (Dkt. # 4–6), Att. B–2 ("Testimony or evidence regarding Landlord Tenant law is outside the scope of this informal hearing."). Indeed, Mr. Weldon will not consider whether a tenant has cured a lease violation. When asked about the eviction of a tenant for allowing a person not named in her lease to live with her, he responded that her effort to cure the violation was irrelevant.

Q: [M]y original question was, do you know what the right to cure means in the landlord-tenant context?

A: And I don't care what it means. . . . It's a little late for I'm sorry when she's allowed the guy to live with her and she admitted it. So there you go.

Weldon Depo. at 106.

The need to consider tenants' legal arguments is apparent in contexts other than evictions. Mr. Shepherd, one of the Plaintiffs, has filed a grievance over SHA's decision to bill him approximately $230 for repairing a clogged sink and a broken toilet handle. Shepherd Decl. (Dkt. 4–2). The RLTA delineates the responsibilities of SHA and Mr. Shepherd in this situation. RCW § 59.18.060(7) (obligating landlord to repair plumbing); RCW § 59.18.060 (making tenant responsible for repairs necessitated by his own negligence); RCW § 59.18.070 (setting time limits for repairs). SHA's policy, however, is that its hearing officers need not consider the RLTA. Mr. Weldon carries out SHA's policy.

The SHA's refusal to consider tenants' legal arguments at grievance hearings violates the law. The law requires SHA to provide a grievance process in which it is possible for the hearing officer to remedy the grievance. Where the tenant's position in a grievance depends on what SHA and Mr. Weldon characterize as a "legal argument," the tenant lacks a grievance remedy. Although the law exempts certain disputes from the grievance process, *see supra* n. 1, nothing in the law permits SHA to unilaterally exempt all legal arguments from the grievance process.[6]

SHA violates the law even though tenants have judicial options for challenging grievance decisions. SHA's reliance on judicial review as an excuse for inadequate grievance procedures is without merit. The same argument would permit SHA to dispense with grievance proceedings entirely, simply because tenants would be

---

**6.** SHA asserts that its policy is that "rather than have hearing officers spend hours trying to understand such [legal] arguments, or decide such arguments incorrectly because they could not get a proper understanding, involved legal arguments should be referred to its Legal Department." SHA's Opp'n at 13. If this is indeed SHA's policy, that policy violates the law, as only hearing officers are empowered to resolve grievances. There is no evidence, however, that this is actually SHA's policy. The record does not reflect a single instance in which Mr. Weldon or any other hearing officer "referred" any legal dispute to SHA's legal department. Weldon Depo. at 117 ("I don't refer [a legal argument] to the legal department. I simply state that it's outside the scope of a simple grievance hearing and the legal department deals with legal issues. I don't—I don't refer anything.").

able to sue. The existence of a Congressionally-mandated grievance procedure is proof enough that Congress did not think judicial remedies alone were adequate to address landlord-tenant disputes in the public housing context.

Two additional observations buttress the court's conclusion that SHA violates the law by refusing to address tenants' legal arguments. First, as the court's repeated use of the phrase may suggest, it is *tenants'* legal arguments that SHA excludes by policy, whereas hearing officers implicitly accept SHA's legal arguments. When a grievance reaches a hearing officer, the SHA has already stated its basis for taking an adverse action against the tenant. That basis is never purely factual. The SHA implicitly states that the law authorizes it to take the adverse action. When a tenant raises a legal argument, he or she is typically raising a counter-argument to the SHA's implicit legal argument. When a hearing officer declines to accept a tenants' legal argument, it is implicitly adopting the SHA's legal position. Even if the law permitted hearing officers to decline to address legal arguments, it plainly would not permit them to address only those arguments that SHA raises. Second, Mr. Weldon's written decisions reveal that even as he refuses to consider what he deems legal arguments, he frequently reaches conclusions that are at least partially legal. He discusses disabilities that affect tenants, allegations of fraud against tenants, and more. *E.g.,* Dunn Decl. (Dkt. # 4–6), Att. B–2, B–3. Neither he nor SHA explains why he can make some legal determinations while refusing to make those that tenants request.

### 3. Plaintiffs Are Likely To Succeed In Showing That Mr. Weldon is Not Currently Qualified to Serve as a Hearing Officer.

Plaintiffs contend that Mr. Weldon is not competent to serve as a hearing officer. In most respects, they are flatly wrong. The law imposes no particular qualifications for a hearing officer, other than impartiality. A person is qualified to be a hearing officer so long as he or she can carry out the requirements of the position. In most respects, the evidence firmly establishes that Mr. Weldon is qualified. His written decisions evidence an ability to convene and to conduct a grievance hearing. Those decisions carefully catalog the testimony and documentary evidence presented at the hearing, and provide a summary of each party's position. He makes credibility judgments when witnesses give divergent testimony. He states conclusion about the facts that he draws from the evidence. Contrary to Plaintiffs' contention, no legal training is necessary to accomplish these tasks. On this record, the court can only conclude that Mr. Weldon executes his duties competently. That he and SHA have formed a policy of not considering tenants' legal arguments is not evidence of incompetence, it is evidence of a mistake of law.

Mr. Weldon must, however, be able to consider legal arguments. As the court has noted, it appears to be SHA policy that he not consider tenants' legal arguments. That he follows SHA policy does not mean that he is unqualified. However, his admissions that he has had no training in the substantive law that governs the landlord-tenant relationship leads the court to conclude that he currently is not qualified to preside over grievance hearings, even if SHA must change that policy. In reaching this conclusion, the court suggests nothing about the nature of the training or experience that would qualify a hearing officer to resolve legal arguments in the context of an SHA grievance. Certainly, a hearing officer need not be an attorney or a law school graduate. A person who has no training or experience in applicable law, however, is not qualified to resolve SHA

grievances. In this single (but critical) aspect of his role as a hearing officer, Plaintiffs are likely to succeed in proving that Mr. Weldon currently lacks the training or experience to preside over grievance hearings.

### 4. Plaintiffs Are Likely To Succeed In Showing That SHA Does Not Comply With Regulations Governing the Selection of Hearing Officers.

HUD regulations unambiguously require SHA to consider the input of tenants in selecting hearing officers. It "shall consult the resident organizations before PHA appointment of each hearing officer or panel member," and it "shall" consider any "comments or recommendations submitted by the tenant organizations" before the appointment. 24 C.F.R. § 966.55(b)(3); see also 24 C.F.R. § 966.53(g) (partially defining "resident organization"). SHA's sole response to the RAC's evidence is to insist that the RAC does not qualify as a "resident organization" with which it must consult. This is a curious contention, given that SHA admits that the RAC is, indeed, a "resident organization." Forsyth Decl. (Dkt. # 18-6) ¶ 5. The SHA also offers no authority for the proposition that the law permits it to decide which "resident organizations" it will consult with. But the court need not resolve those concerns, because the SHA has submitted no evidence that it consulted with any resident organization before selecting Mr. Weldon. SHA admits that it recognizes at least one resident organization. Id. ¶ 4. It does not, however, provide evidence that it consulted with this organization on the appointment of Mr. Weldon or any other hearing officer. Under these circumstances, Plaintiffs are virtually assured of succeeding on the merits of their claim that SHA did not consult resident organizations before selecting Mr. Weldon.

The court does not agree, however, that SHA's failure to consult with resident organizations means that Mr. Weldon lacks "jurisdiction" to resolve grievances. Pltfs.' Mot. at 22. Regulations give resident organizations input into hearing officer selection, but they do not give the organizations veto power. Even had SHA complied with the law, it was free to select Mr. Weldon as a hearing officer. Plaintiffs cite no authority discussing the proper remedy for a violation of the selection regulations, and the court is aware of none. Absent that authority, the court declines to conclude that the remedy for such violations is to remove a hearing officer. Plaintiffs would not have had the power to remove Mr. Weldon had SHA followed the law by consulting resident organizations. They do not gain that power merely because SHA did not comply with the law.

### D. Plaintiffs Will Suffer Irreparable Harm As A Result of SHA's Policy of Not Considering Legal Arguments in Grievance Hearings.

The court now considers whether Plaintiffs face irreparable harm as a result of those aspects of the policies and conduct of SHA and Mr. Weldon that they are likely to succeed in challenging.

The court finds that Plaintiffs are not irreparably harmed by SHA's failure to consult with resident organizations. As the court has already observed, even if SHA strictly complied with the law, no resident organization can prevent the selection of a hearing officer. Although there is no doubt a harm arising from the exclusion of residents from the selection process, it is not a harm that can be remedied by removing the hearing officer. Plaintiffs proposed a detailed injunction. Nowhere in that injunction do they ask that SHA be enjoined to conduct the selection of a hearing officer in compliance with the regula-

tions. Additionally, SHA has at least complied with the regulations to the extent that they require it to consider the input of the RAC, albeit after Mr. Weldon had already been selected. The record reflects that SHA considered RAC's input and declined to remove Mr. Weldon from his post. Dunn Decl. (Dkt. # 4–6) Att. C–1, C–2. SHA could have done the same had it considered the RAC's input before hiring Mr. Weldon. Because the law does not permit the RAC to override SHA's choice of hearing officer, the court finds no irreparable harm from Mr. Weldon continuing to serve as an officer.

■ The court finds that Plaintiffs are likely to face irreparable harm from SHA's refusal to consider tenants' legal arguments in grievances. Grievance hearings are informal, and any errors made in the grievance process can be remedied in a judicial proceeding. From that premise, SHA reasons that there is no irreparable harm from being deprived of a meaningful grievance. The court disagrees. With narrow exceptions, Congress mandated access to grievance hearings for all disputes, even as it mandated that judicial remedies be available regardless of the outcome of the grievance. Under current SHA policy, any tenant with a "legal" problem cannot receive a meaningful grievance hearing. That is a harm, and it is a harm that cannot be remedied if tenants continue to be denied access to meaningful grievance hearings pending trial in this case. By SHA's reasoning, it would not cause irreparable harm to tenants even if it directed hearing officers to resolve every grievance in its favor, because tenants could seek judicial remedies. The court concludes that Congress did not intend that result.

For the same reasons, Plaintiffs face irreparable harm if Mr. Weldon is permitted to continue to preside over grievances. If the court were to order SHA to abandon its policy against considering tenants' legal arguments, Mr. Weldon could not preside at grievance hearings without perpetuating the irreparable harm that arises from that policy. Until he acquires the training or experience to consider legal arguments, any tenant who relies on a legal argument will face irreparable harm.

### E. The Balance of Hardships Tips in Plaintiffs' Failure.

Before considering the balance of hardships, the court notes that its previous findings support only the entry of a limited injunction—one that prevents SHA from continuing to conduct grievance hearings in which the hearing officer will not consider legal arguments. Because Mr. Weldon is not currently trained to consider legal arguments, that injunction would also prohibit him from serving as a hearing officer.[7] With this possible injunction in mind, the court considers the balance of hardships.

Having already discussed the harm facing Plaintiffs, the court considers the hardship on SHA. The court does so even though SHA failed to address what hardship it would face as the result of an injunction. There is no hardship in SHA rescinding its policy of permitting its hearing officers to decline to consider tenants' legal arguments. As a result of that change, Mr. Weldon and possibly other hearing officers will be unable to preside at grievance hearings to the extent they lack training to consider legal arguments.

---

7. The court has considered an injunction that would prohibit Mr. Weldon from serving as a hearing officer only in those cases in which a party relies on a legal argument, but the court finds no evidence that there is a significant number of grievances that do not present legal issues. Given the web of federal, state, and local law that governs the obligations of SHA and its tenants, the court finds it unlikely that purely non-legal grievances arise.

That may require SHA to invest money and time in additional training or hiring more hearing officers. The court can only speculate, however, because SHA has offered no evidence on the issue. The record reflects that the SHA employs several other hearing officers who are at least trained to resolve legal arguments, and in some cases are attorneys. It retains a panel of attorneys to resolve Section 8 voucher termination grievances. When the King County Superior Court ordered a new hearing in Ms. Bin's grievance, SHA assigned a hearing officer who considered and addressed Ms. Bin's legal arguments. Dunn Decl. (Dkt. # 4-6), Att. E-4 (Feb. 25, 2010 grievance decision containing "Conclusions of Law"). To the extent that employing those officers to resolve more grievances imposes a financial hardship on SHA, the court finds that the hardship to Plaintiffs outweighs it.

Mr. Weldon, on the other hand, has presented evidence that he will suffer financial hardship and reputational damage. As to reputational harm, the court is not persuaded. To the extent that the court has not already made this clear, it reiterates that its ruling today reflects no adverse judgment on Mr. Weldon. Mr. Weldon has adjudicated grievance hearings in accordance with SHA policy. He is not the source of that policy. The court also emphasizes that the sole reason that Mr. Weldon cannot hear grievances is that he *currently* lacks the training to resolve legal arguments. This is no slight to Mr. Weldon. The financial impact on Mr. Weldon is no doubt a hardship. The court cannot speculate on the magnitude of that hardship, however, as there is no evidence of what SHA pays him as a hearing officer, or of Mr. Weldon's financial situation. On this record, the court concludes that the hardship to Plaintiffs outweighs Mr. Weldon's financial hardship. Mr. Weldon, moreover, can ameliorate his hardship by acquiring sufficient knowledge to adjudi-cate the legal disputes he faces as a hearing officer.

### F. The Public Interest Favors Plaintiffs.

To the extent that the public interest (as opposed to the interests of SHA tenants) is implicated in today's ruling, it favors requiring SHA to follow the law. SHA does not argue otherwise.

### G. The Court Grants HUD's Motion to Dismiss.

Plaintiffs named HUD a Defendant despite their admission that they "advance no claims or causes of action against HUD...." Compl. ¶ 3.5. Plaintiffs apparently named HUD because they were concerned that HUD might be a required party within the meaning of Fed.R.Civ.P. 19. No one, not Plaintiffs, not HUD, and not SHA or any other Defendant, has articulated any reason that HUD is a required party. The court has no reason to reach a different conclusion. *See* Fed. R.Civ.P. 19(a)(1) (defining "Required Party"). The court accordingly grants HUD's motion to dismiss.

## IV. PRELIMINARY INJUNCTION

Pending further order of the court, the court enjoins Defendant Seattle Housing Authority and all of its grievance hearing officers from engaging in the following acts:

1) Conducting grievance hearings in which hearing officers decline to consider arguments based on applicable federal, state, or local law.

2) Assigning hearing officers who lack training or experience to consider and resolve arguments based on applicable federal, state, or local law to preside over grievance hearings.

## V. CONCLUSION

For the reasons stated above, the court GRANTS Plaintiffs' motion for a preliminary injunction (Dkt. # 4) and imposes the injunction set forth in the previous section. The court GRANTS HUD's motion to dismiss (Dkt. # 27) and directs the clerk to terminate HUD as a party.